# IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **v.** | ) **Cr. No. 98-329-01-06 (TPJ)** |
| | ) |
| **VINCENT HILL, aka Vito,** | ) |
| **JEROME MARTIN, aka Pimp,** | ) |
| **SEAN COATES, aka Birdie,** | ) |
| **WILLIAM SWEENEY, aka Draper** | ) |
| **SAM CARSON, aka Chin** | ) |
| **MAURICE PROCTOR, aka Poo-Poo** | ) |
| | ) |
| | ) |
| **Defendants.** | ) |
| | ) |
| **GARY PRICE, aka Harry-O** | ) **Cr. No. 99-348-01 (TPJ)** |
| | ) |

**FILED**

FEB 14 2001

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

## GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTION FOR MISTRIAL AND SEVERANCE REGARDING TESTIMONY OF WITNESS THEODORE WATSON

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits its opposition to the defendants' motion for mistrial and severance regarding testimony of witness Theodore Watson (hereinafter "defendants' motion for mistrial"). As grounds for this opposition, the government cites the following points and authorities and any such authority which may be cited at a hearing upon the motion.[1]

## PROCEDURAL HISTORY

On February 8, the government called Theodore Watson as a witness at trial. Mr. Watson testified regarding conversations that he had with defendant Sweeney while the two men were

---

[1] The government notes that it did not object to the proposed instruction submitted by the defendants in his motion for mistrial. The instruction, which tells the jury that it can only consider the testimony by Watson against defendant Sweeney (the declarant) and not any other defendant, was given to the jury during the course of the witness' testimony on February 11, 2001.

537

incarcerated at the Northern Neck Regional Jail in Warsaw, VA.[2]  In referring to criminal

conduct, defendant Sweeney made references to others using the terms "we" throughout his

discussions with Watson.  In response, Watson referred to Sweeney asking him questions about

what "they" did.  At no time did Watson indicate that Sweeney named any particular individual as

being part of the "we" or "they."  Nor did Watson indicate the number of individuals who

comprised the "we" referenced by Sweeney.  Simply put, the jury was told that Sweeney

acknowledged that his criminal conduct included other people.

Counsel for Sweeney's co-defendants have objected to this line of inquiry under Bruton[3]

grounds, claiming that their clients Sixth Amendment rights to confrontation have been violated

insofar as they were unable to cross-examine Sweeney regarding these statements to Watson.

Their arguments are misplaced, and thus the motion should be denied.

## ARGUMENT

1.    STATEMENTS WHICH ARE ADMISSIBLE SOLELY AGAINST THE
DECLARANT-DEFENDANT CAN BE REDACTED TO PREVENT PREJUDICE TO
THE OTHER DEFENDANTS

Case law interpreting Bruton has held that statements of a non-testifying co-defendant are

admissible provided that (1) the statement is redacted to eliminate any incrimination of the other

defendant or defendants and that (2) a proper limiting instruction is given to the jury.  Richardson

v. Marsh, 481 U.S. 200, 211 (1987).  In Richardson, the Supreme Court held that the Sixth

Amendment is violated only when a co-defendant's confession "expressly implicat[es]" the

defendant.  Id. at 208, quoting Bruton, 391 U.S. at 124 n.1.  The Court explained that a

---

[2]  A copy of the transcript of Mr. Watson's direct examination is attached as Appendix A.

[3]  Bruton v. United States, 391 U.S. 123 (1968).

defendant's Sixth Amendment rights are not violated where the government introduces a co-
defendant's confession that is "not incriminatory on its face, and [becomes] so only when linked
with evidence introduced later at trial." Id. The challenged statement in that case had been
redacted to eliminate not only the defendant's name, but any reference to his or her existence.
The Court found that the defendant's confrontation rights were not violated by the admission of a
statement that was completely sanitized in that manner.  It expressly reserved opinion, however,
on the question of the "admissibility of a confession in which the defendant's name has been
replaced with a symbol or neutral pronoun." Id. at 211. n. 5.

Recently, the Supreme Court in Gray v. Maryland,  118 S. Ct. 1151 (1998) further
clarified the meaning of Richardson and Bruton. In Gray, Gray and Bell were jointly tried for
murder. Bell had confessed, stating that he, Gray, and another accomplice (who had since died)
had killed the victim. The trial court admitted Bell's confession after ordering it redacted. Bell's
confession was redacted by substituting the words "deleted" or "deletion" for Gray's or the other
accomplice's name or, when submitted in writing, by omitting their names but leaving in their
place blank white spaces separated by commas. Bell did not testify.

In holding that Bell's statement violated Bruton, id. at 1157, the Gray Court explained that
"[r]edactions that simply replace a name with an obvious blank space or a word such as 'deleted'
or a symbol or other similarly obvious indications of alteration ... leave statements that,
considered as a class, so closely resemble Bruton's unredacted statements that ... the law must
require the same result." Gray, 118 S. Ct. at 1155 (emphasis added); accord id. at 1156 ("[W]e
believe that, considered as a class, redactions that replace a proper name with an obvious blank,
the word 'delete,' a symbol, or similarly notify the jury that a name has been deleted are similar

3

enough to Bruton's unredacted confessions as to warrant the same legal results.") The Court relied heavily on the fact that deletions from Bell's statement were "obvious," repeatedly mentioning the fact in its short opinion. The Court emphasized that "[t]he blank space in an obviously redacted confession ... points directly to the defendant," distinguishing it from Richardson, in which other evidence was necessary from which to infer the connection between statement and defendant. Id. at 1156, 1157.

Where the neutral pronoun cannot be interpreted to isolate a particular individual or individuals, there can be no Bruton problem.   A number of other courts -- including the D.C. Circuit -- have so interpreted Gray. See, e.g., United States v. Logan, 210 F.3d 820 (8th Cir.)(en banc) (at a four-codefendant trial on gun-trafficking and conspiracy charges, where two of the defendants, Long and Roan, were separately charged with the robbery of a Minnesota gun shot, the admission at trial of Roan's post-arrest, redacted, oral statement to a police officer that he and "another individual" had robbed the gun shop and killed the two proprietors did not violate Logan's Confrontation Clause rights under Bruton and Gray), cert. denied, _____ S. Ct. _____ (2000); United States v. Verguzco-Martinez, 186 F.3d 1208, 1214 (10th Cir. 1999) ("where a defendant's name is replaced with a neutral pronoun or phrase there is no Bruton violation, providing that the incrimination of the defendant is only by reference to evidence other than the redacted statements and a limiting instruction is given to the jury"); United States v. Vejar-Urias,165 F3d 337, 339 (5th Cir. 1999) ("where a defendant's name is replaced with a neutral pronoun, as long as identification of the defendant is clear or inculpatory only by reference to evidence other than the redacted confession, and a limiting instruction is given to the jury, there is no Bruton violation"); United States v. Wilson, Wilson & Judd, 160 F.3d 732, 740 n.5 (D.C.

4

Cir. 1998) ("the Court in Gray revisited Bruton and Richardson to clarify that statements that incriminate only inferentially are outside the scope of Bruton"); United States v. Peterson, 140 F.3d 819, 822 (9th Cir. 1998) ("Gray clarifies that the substitution of a neutral pronoun or symbol in place of the defendant's name is not permissible if it is obvious that an alteration has occurred to protect the identity of a specific person") (emphasis added).

Applying the Bruton-Richardson-Gray analysis to this case, no Confrontation Clause violation occurred. As noted above, the jury would have to make substantial inferences from the trial evidence to conclude that the "we" or the "they" in the statements -- viewed alone -- referred to the remaining co-defendants. At the very least, the statements made by Sweeney do not facially or obviously refer to any particular defendant or defendants.  Instead, at most, the statements will incriminate the other defendants only when connected to the trial evidence.  Finally there has already been evidence that the "K Street Crew" was comprised of at least nineteen people who were identified from the photoboards in the courtroom.  To the extent that there is concern over who comprised the "we" about which Watson testified, the universe of people who could fit within that category is immense. Accordingly, admission of the statements did not violate the Sixth Amendment.

2.    STATEMENTS WHICH ARE INDEPENDENTLY ADMISSIBLE AGAINST THE DEFENDANTS DO NOT RAISE BRUTON CONCERNS

As defendant Carson concedes in his motion for mistrial, if there are independent grounds which allow for the challenged statements to be admitted, he cannot claim a Sixth Amendment violation under Bruton.  Interestingly, in the motion for mistrial, the defendant submits that the government's only independent means by which to admit the statements by Sweeney to Watson as

5

co-conspirator statements. The government submits that the statements made by Sweeney to Watson are not co-conspirator statements. We submit that the statements are admissible as (1) statements against Sweeney's penal interest; and/or (2) statements which bear sufficient indicia of reliability to warrant admission. Under either theory the statements are admissible not only against Sweeney but also against all the co-defendants.[4] Rule 804(b)(3) of the Federal Rules of Evidence 'is based on the idea that 'declarations against interest are reliable because people do not make such statements unless believing them to be true.'" United States v. Wilson, 160 F.3d 732, 741 (D.C. Cir. 1998). Alternatively, the government submits that the statements bear sufficient indicia of reliability and have particularized guarantees of trustworthiness to warrant their admission at trial.

The Confrontation Clause forbids the use of hearsay against a criminal defendant at trial unless the evidence "falls within a firmly rooted hearsay exception" or otherwise contains "particularized guarantees of trustworthiness." Ohio v. Roberts, 448 U.S. 56, 66 (1980). Here, Sweeney's confidential communications to his fellow inmate Watson, were made without motive to shift blame, and were reliable, trustworthy and against Sweeney's penal interest. See e.g., Dutton v. Evans, 400 U.S. 74 (1970)(admission against defendant of hearsay statements by codefendant to cellmate did not violate defendant's rights under Confrontation Clause). Lilly v. Virginia, 527 U.S. 116 (1999) is not to the contrary. In that case, the Supreme Court held only that a post-arrest, custodial, blame-shifting statement, made to the police by the defendant (Mark

---

[4] While we believe that the statements could be admitted against all defendants without any limiting instruction (such as the Court gave), we do not intend to argue that the statements should be used against anyone other than defendant Sweeney. Thus, we remain in agreement that the instruction given to the jury was appropriate.

6

Lilly), was not admissible against the codefendant (Mark Lilly's brother, Benjamin Lilly).

In addition, even if this Court were not to find that the statements by Sweeney were against his penal interest, the Court may find that the statements bear sufficient indicia of trustworthiness to warrant their admission.   There was no blame-shifting at all in the statement made by Sweeney.  He confessed his involvement in robberies, witness-intimidation, drug activity, illegal conduct at the D.C. Jail, and other incriminating statements to a fellow inmate and confidant, who could offer no benefits to him for these statements.   Sweeney did not minimize his role in the organization in any way.  Thus, in addition to the "firmly rooted" argument set forth above, it should be noted that an accomplice's statement to his friend, family member or fellow inmate, given the circumstances in which the statement was made, bears "particularized guarantees of trustworthiness" and that its admission into evidence, against a codefendant, is not barred by the Confrontation Clause.

WHEREFORE, for the foregoing reasons, the government submits that the defendants' motion for mistrial and severance should be denied.

Respectfully Submitted,

WILMA A. LEWIS
United States Attorney
D.C. Bar No. 358-637

*Peter R. Zeidenberg (ac)*

Peter R. Zeidenberg
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20001
(202) 353-8831
D.C. Bar No. 440-803

*Anjali Chaturvedi*

Anjali Chaturvedi
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20001
(202) 353-8827
D.C. Bar No. 446-177

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was delivered by hand to defense counsel listed below on this 14th day of ___February___, 2001.

*Anjali Chaturvedi*

Anjali Chaturvedi
Assistant United States Attorney

Steven R. Kiersh, Esq.
717 D Street, N.W.
Suite 400
Washington, D.C. 20004

Christopher M. Davis, Esq.
601 Indiana Avenue, N.W. #910
Washington, D.C. 20004

Joanne Hepworth, Esq.
305 H Street, N.W., 2nd Floor
Washington, D.C. 20001

Joseph Beshouri, Esq.
419 7th Street, N.W.
Suite 201
Washington, D.C. 20004

Lexi Negin Christ, Esq.
419 7th Street, N.W.
Suite 201
Washington, D.C. 20004

Howard Bramson, Esq.
717 D Street, N.W.
3rd Floor
Washington, D.C. 20004

Frederick Jones, Esq.
901 6th Street, S.W., #409
Washington, D.C. 20024

Jonathan Zucker, Esq.
601 Indiana Avenue, N.W.
Suite 910
Washington, D.C. 20004

# APPENDIX A

FILED

FEB 1 4 2001

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

CR 98-329

CR 98-329                     UNITED STATES  vs.  VINCENT HILL, et al.                  AFTERNOON SESSION

Page 38

1     MR. BESHOURI: Mr. Watson. And I suspect this will
2 happen time to time during this trial.
3     THE COURT: I expect.
4     MR. BESHOURI: What would the Court intend to do as
5 far as -- since the jury hasn't been asked if they know this
6 person, that sort of issue may repeat itself during this
7 trial.
8     THE COURT: I am hoping that the jury will -- any
9 juror who is acquainted with this witness will alert us to
10 that fact in time to do something about it.
11     MR. BESHOURI: Would the Court consider maybe at
12 this stage, since this is the first time this has happened, at
13 least advise the jury that should any witness come before them
14 that they recognize or have some familiarity with that they
15 reveal that to the Court.
16     THE COURT: I think that's a fair request, if this
17 witness is not on the list that was appended to the
18 questionnaire.
19     MR. ZEIDENBERG: We'd concur.
20     THE COURT: It was not?
21     MR. ZEIDENBERG: It was not, and we concur that that
22 would be a wise --
23     THE COURT: Okay. I will do that.
24     (Recess.)
25     THE COURT: All right. Are you ready for the jury?

Page 39

1     MR. ZEIDENBERG: Yes, Your Honor.
2     THE COURT: Send for our witness.
3     THE DEPUTY MARSHAL: Jury panel, Your Honor.
4     (Jury In.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 40

1     (Jury In.)
2     THE DEPUTY MARSHAL: Jury panel is all present, Your
3 Honor.
4     THE COURT: Thank you, Marshal. All right, sir.
5     MR. ZEIDENBERG: Your Honor, the government would
6 call Theodore Watson to the stand.
7     THEODORE R. WATSON, GOVERNMENT'S WITNESS, SWORN
8              DIRECT EXAMINATION
9 BY MR. ZEIDENBERG:
10 Q. Good afternoon, sir.
11 A. Afternoon.
12 Q. Can you please identify yourself?
13 A. Theodore R. Watson.
14 Q. I'm sorry. Can you spell your last name for the record?
15 A. W-A-T-S-O-N.
16 Q. Mr. Watson, how old are you, sir?
17 A. 60.
18 Q. I'm sorry?
19 A. 60.
20 Q. And, sir, can you tell us where it is you're from
21 originally?
22 A. Washington, D.C.
23 Q. Can you tell us where you grew up in Washington, D.C.?
24 A. Northeast, Southeast.
25 Q. Did you go to school in D.C.?

Page 41

1 A. Yes.
2 Q. Where did you go to school?
3 A. Eastern High School and Federal City College.
4 Q. What is Federal City College or what was Federal City
5 College?
6 A. It was an inner city college that is now called UDC.
7 Q. How many years did you go to college?
8 A. Two and a half.
9 Q. Now, did you go to college right after high school or was
10 there some time intervening?
11 A. Some time in between.
12 Q. Can you tell the ladies and gentlemen what jobs you've
13 had since -- without going through your entire work history,
14 sir, just tell us generally what type of employment you have
15 generally had?
16 A. I was a blueprint operator, supervisor at Bonnefill
17 Reproduction Company in Silver Spring, Maryland. I was also
18 working two jobs. After I left the Silver Spring job, I went
19 to Professional Pharmacy where I worked there as a
20 pharmacist's assistant and delivery.
21     From there I worked in retail at Rosenblatt's in the 700
22 block of D Street, Northwest and also Shirt Tails in Mount
23 Pleasant in Northwest.
24 Q. And you say you have worked as a pharmacist's assistant
25 before?

11 (Pages 38 to 41)

CR 98-329            UNITED STATES  vs.  VINCENT HILL, et al.            AFTERNOON SESSION

Page 42

1   A.   Yes.
2   Q.   How many years did you spend doing that?
3   A.   About 15, 16 years.
4   Q.   What were the time frames you were working as a
5   pharmacist's assistant?
6   A.   Well, at the Professional Pharmacy, Prescription Parlor
7   and my latest job, -- Pharmacy, I was there about seven years.
8   Q.   What was the time frame?  What years were you working
9   there?
10  A.   Which one?
11  Q.   The two pharmacy jobs you just described?
12  A.   In '82 to about '86, and from '92 to '99.
13  Q.   Now, Mr. Watson, you have a number of criminal
14  convictions; isn't that correct?
15  A.   Yes.
16  Q.   And I'd like to take you back and talk about those for
17  just a minute. Starting in 1963, did you -- was that the date
18  of your first criminal conviction?
19  A.   Yes.
20  Q.   What was that for?
21  A.   Receiving stolen property.
22       THE COURT:  I'm sorry.  What was the year again,
23  sir?
24       THE WITNESS:  1963.
25  BY MR. ZEIDENBERG:

Page 43

1   Q.   You have to, if you can, --
2   A.   '63.
3   Q.   Directing your attention to 1973, 10 years later, did you
4   pick up your second criminal conviction in 1973?
5   A.   Yes.
6   Q.   What was that for?
7   A.   Possession with the intent to distribute heroin.
8   Q.   Then in 1976, did you have another conviction?
9   A.   Yes.
10  Q.   What was that for?
11  A.   For the same thing, possession with intent to distribute
12  heroin.
13  Q.   1977?
14  A.   Escape.
15  Q.   That was a conviction for escape in 1977?
16  A.   Yes.
17  Q.   Directing your attention to 1988, did you get another
18  conviction at that time?
19  A.   Yes.
20  Q.   What was that for?
21  A.   Conspiracy to distribute controlled substance.
22  Q.   And finally, Mr. Watson, did you have a conviction in the
23  year 2000?
24  A.   Yes.
25  Q.   What was that for?

Page 44

1   A.   Possession with the intent to distribute pharmaceutical
2   drugs.
3   Q.   Where was that conviction out of?
4   A.   Greenbelt, Maryland.
5   Q.   Is that the United States District Court?
6   A.   Yes, it was.
7   Q.   What type of sentence did you receive from that
8   conviction last year?
9   A.   105 months.
10  Q.   Of that 105 months, how much of that sentence
11  approximately have you served?
12  A.   Two years.
13  Q.   So you have approximately how much to go?
14  A.   About -- a little over six.
15  Q.   Six what?
16  A.   Years.
17  Q.   Now, after you were sentenced on your charge out of
18  Greenbelt, where did you go?
19  A.   Charles County Detention Center.
20  Q.   What month were you -- do you remember the date that you
21  were sentenced?
22  A.   February 4, 2000.
23  Q.   And after you went to -- approximately how long were you
24  in Charles County?
25  A.   After my sentence?

Page 45

1   Q.   Yes.
2   A.   Maybe a few weeks.
3   Q.   And after you were in Charles County, where did you go?
4   A.   I was transferred from Charles County to Northern Neck
5   Virginia Regional Jail, Warsaw County.
6   Q.   Approximately when did you get to Northern Neck?
7   A.   Sometime in March
8   Q.   That would be March of what year?
9   A.   2000.
10  Q.   How long were you at Northern Neck?
11  A.   Oh, about three weeks.
12  Q.   Now, while you were at Northern Neck Regional Jail, did
13  you meet someone there by the name of Draper?
14  A.   Yes.
15  Q.   Did you ever get to know his true name?
16  A.   Yes.
17  Q.   What was that?
18  A.   William Sweeney.
19  Q.   Do you see Mr. Sweeney in court today?
20  A.   Yes.
21  Q.   Could you point him out please?
22  A.   The gentleman sitting there with the yellow shirt on and
23  the glasses.
24       MR. ZEIDENBERG:  Your Honor, may the record reflect
25  the identification of William Sweeney?

12 (Pages 42 to 45)

CR 98-329                UNITED STATES  vs.  VINCENT HILL, et al.                AFTERNOON SESSION

Page 46

1      MR. KIERSH: No objection.
2      THE COURT: The record will so reflect.
3  BY MR. ZEIDENBERG:
4  Q.  Now, can you describe how it was you met Mr. Sweeney?
5  A.  Another gentleman by the name of Wayne Johnson and I were
6  in his room --
7  Q.  Mr. Johnson's room?
8  A.  Mr. Johnson's room discussing law. And he said, one of
9  your homey's is here. I said, excuse me? Yeah, he said, one
10 of my homey's is here. I said, yeah, where? He said, the
11 next room to me. His name is Sweeney.
12     So I said, I'll holler at him. So when we finished
13 talking, I went and introduced myself to Mr. Sweeney, and we
14 started our conversation from there.
15 Q.  Now, when you first met Mr. Sweeney, how did he identify
16 himself?
17 A.  Well, when I spoke to him, he said, my name -- I'm
18 Draper, and I said, eh? Because, you know, I never heard of
19 him. And he said, you haven't heard of me? I said, no. I
20 said, old enough to be your grandfather, you
21 know. I said, I haven't heard of you, you know. And we went
22 from there.
23 Q.  Now, where were you housed in Northern Neck in relation
24 to Mr. Sweeney during the time that you were there?
25 A.  We were on the second tier. We were about three cells

Page 47

1  apart.
2  Q.  And was that during the entire time that you were there?
3  A.  Yes.
4  Q.  While you were at Northern Neck Regional Jail, are you
5  confined to your cells all day or are you allowed some ability
6  to leave your cell?
7  A.  We're generally out practically all day, except for count
8  time.
9  Q.  And when you say, we, who are you referring to?
10 A.  The whole population.
11 Q.  Where was it that you were able to spend your time while
12 you were down at Northern Neck Regional Jail? In other words,
13 when you're not in your cell, if you could just explain to the
14 ladies and gentlemen of the jury what the physical area looks
15 like and where it is that you spend your free time?
16 A.  Well, it was like a big dining area. It's several
17 tables, a telephone on the wall, a TV up on a stand, and like
18 I say, tables all around. You can sit and play cards,
19 whatever you chose to do at that time or use the telephone.
20 Q.  Now, while you were at Northern Neck --
21     THE COURT: I missed something a minute ago. You
22 say that most of your time is spent outside your cells except
23 for -- except for what?
24     THE WITNESS: Count time. When they're counting.
25     THE COURT: Count time. And otherwise you are at

Page 48

1  liberty?
2      THE WITNESS: Out.
3      THE COURT: I mean, in the institution?
4      THE WITNESS: Yes.
5      THE COURT: All right.
6  BY MR. ZEIDENBERG:
7  Q.  How often did you speak with Mr. Sweeney during the time
8  you were at Northern Neck?
9  A.  We basically spoke, exchanged pleasantries every day.
10 Q.  Now, did you have a conversation with Mr. Sweeney about
11 where he had been prior to his arrival at the Northern Neck
12 Regional Jail?
13 A.  Yes.
14 Q.  Where did he say he had been?
15 A.  The D.C. Jail.
16 Q.  Did he describe for you what the conditions were like for
17 him at the D.C. Jail?
18 A.  Yes.
19 Q.  What did he tell you?
20 A.  He said it was very good for him. He said that they had
21 cell phones, the pagers, anything they wanted to eat, drink,
22 whatever they needed it was there.
23 Q.  Did he talk to you about any potential witnesses that
24 were at the D.C. Jail?
25 A.  One. He said that they would try to get to him. There

Page 49

1  was one witness that they were trying to get to.
2  Q.  Can you tell us about that conversation?
3  A.  Well, it stemmed from, you know, was just talking. We
4  was just talking about the conditions there, I mean, how it
5  was, and he said, it was just a witness there that they were
6  trying to get to.
7      MR. BESHOURI: Your Honor, objection, and may we
8  approach?
9      THE COURT: Yes.
10     (Bench conference on the record.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

13 (Pages 46 to 49)

CR 98-329 · UNITED STATES vs. VINCENT HILL, et al. · AFTERNOON SESSION

Page 50

1 (Bench conference on the record.)
2 MR. BESHOURI: To the extent that this witness is
3 speaking about they, it --
4 THE COURT: To the extent what?
5 MR. BESHOURI: This witness is speaking about what
6 they did as opposed to what Mr. Sweeney did. It sets up a
7 Bruton problem here.
8 THE COURT: It is substantially a Bruton problem, a
9 variant of it.
10 MR. ZEIDENBERG: Agreed. However, there is not
11 going to be any mention in his testimony of any of these co-
12 defendants.
13 THE COURT: As to who they are?
14 MR. ZEIDENBERG: They are. He's not going to
15 identify anyone. I've sanitized that portion of his testimony
16 that concerns any of his other co-defendants by name, so that
17 it's going to be completely -- no one is going to be
18 identified like me and Sam, me and Pimp, any of these co-
19 defendants will be identified.
20 MR. BESHOURI: But I think it's going to be
21 implicit. They are trying to do this. Given that these
22 people are all joined together and Bruton covers the implicit
23 suggestion of the people joined.
24 THE COURT: This is an admission, not a confession.
25 Bruton was a confession, right?

Page 51

1 MR. BESHOURI: No, I don't think Bruton is confined
2 to a confession. Bruton, it may have been the Bruton case.
3 THE COURT: Well, it was. This is somewhat
4 different.
5 MR. BESHOURI: But the situation remains that I
6 won't be able to cross-examine Mr. Sweeney's statements to
7 this witness, alleged statements to this witness that he and
8 others were doing something about witnesses. And in that
9 sense, that's the essence of the Bruton issue.
10 THE COURT: We get back to a statement of a co-
11 conspirator.
12 MR. BESHOURI: Well, but this was after the
13 conspiracy was over. Your Honor, they'd all been arrested.
14 THE COURT: I don't think any statement having to do
15 with getting a witness in relation to a conspiracy prosecution
16 is outside the scope of the conspiracy. Whether it is, I
17 still think it's admissible, so long as he doesn't identify
18 individuals.
19 MR. ZEIDENBERG: Very well.
20 MR. ZUCKER: Your Honor, if I may, though, I, and
21 perhaps, and perhaps others may seek to elicit that Gary Price
22 was not included in that day. I feel I might need to do that
23 in order to not suffer any prejudice.
24 THE COURT: You may have to ask him whether or not
25 he had heard the name, Gary Price, whether the name Gary Price

Page 52

1 was associated with any --
2 MR. ZUCKER: And Mr. Price, of course, is not
3 charged with that aspect of the conspiracy, and I might choose
4 to do that. In which case it will highlight that others are
5 not going to ask the same question. And in so doing, it will
6 implicate them.
7 THE COURT: You've got an objection?
8 MR. KIERSH: I don't have an objection. I just want
9 to alert the Court that I may ask for a recess. I had no hint
10 that this man was coming on. I've never heard of him, and I
11 haven't had any opportunity to investigate him.
12 THE COURT: Unfortunately, the law doesn't afford
13 you notice of something like this.
14 MR. KIERSH: Well, but if the Court will give me
15 time over the --
16 THE COURT: To do what?
17 MR. KIERSH: Find out who this man is. I would
18 endeavor to find -- learn more about this man. There are
19 questions I have that may be a Roviaro violation with respect
20 to this man because I don't -- Judge, this man seems to have
21 been planted down in Warsaw just to elicit this testimony.
22 And if he was, because that's the only way he could
23 have gotten down to Warsaw. It's a state jail. Nobody gets
24 sentenced in Greenbelt, Maryland to serve a federal sentence
25 in a county jail unless they're planted there.

Page 53

1 And if he was planted --
2 THE COURT: Once he testifies, if you cross-examine
3 and you find that you need to develop or you can develop some
4 other information, he is available for you to recall.
5 MR. KIERSH: Let me just alert the Court to the
6 problem that I see. If he were planted in Warsaw to -- and it
7 certainly seems like he was. It certainly sounds like he was
8 set up to go down and introduce himself to Mr. Sweeney to have
9 just this type of conversation.
10 And it's a violation of Mr. Sweeney's rights under
11 the Sixth Amendment.
12 MR. ZEIDENBERG: I would concur with that legal
13 assessment by the way if it were true.
14 MR. KIERSH: But you can see where I am going. My
15 concern is --
16 THE COURT: I can see where you're going, but
17 sufficient unto the day is the evil thereof. I'm not going to
18 deal with a problem with which I am not confronted right now.
19 MR. KIERSH: Okay. But just so the Court knows,
20 I'll be going there on cross.
21 THE COURT: I am alerted.
22 (End of bench conference.)
23
24
25

14 (Pages 50 to 53)

Beverly J. Byrne
Official Court Reporter

CR 98-329                    UNITED STATES  vs.  VINCENT HILL, et al.              AFTERNOON SESSION

Page 54

1    (End of bench conference.)
2        MR. KIERSH: May I have Court's indulgence?
3        THE COURT: Sure.
4    (Pause.)
5        THE COURT: Are you ready?
6        MR. KIERSH: Yes, Your Honor. Thank you.
7        THE COURT: Okay. Mr. Zeidenberg, you may proceed.
8    BY MR. ZEIDENBERG:
9    Q.  You were telling us, Mr. Watson, before the bench
10   conference that you had a conversation with Mr. Sweeney in
11   which he told you about efforts to get a witness at the D.C.
12   Jail.
13       Could you just tell us about that conversation, what you
14   recall of it?
15   A.  He just said that when he was there, he said, you know,
16   we were also trying to get hold of a potential witness
17   upstairs that was supposed to be testifying in a case against
18   us, you know. And that's about as far as he left it. That's
19   the extent of it.
20   Q.  Okay. Now, did --
21       THE COURT: Upstairs at the D.C. Jail?
22       THE WITNESS: I don't know.
23       THE COURT: All right.
24   BY MR. ZEIDENBERG:
25   Q.  Did you have any discussions with Mr. Sweeney about how

Page 55

1    he was faring or how he was enjoying life at Northern Neck?
2    A.  Well, it wasn't the same as it was at D.C. Jail. Just
3    the regular jail time he was doing there. Was no big deal
4    about this one here at Northern Neck.
5    Q.  Did he say what he was going to do about it?
6    A.  At one point he said, we got to make a power move and get
7    the fuck up out of here.
8    Q.  A power move?
9    A.  Yes.
10   Q.  Now, what did you understand that to mean?
11       MR. BRAMSON: Objection.
12       THE COURT: Overruled.
13       THE WITNESS: They were going to escape.
14   BY MR. ZEIDENBERG:
15   Q.  Now, did you have any conversations with Mr. Sweeney
16   about criminal activity that he had been involved in?
17   A.  Yes.
18   Q.  Can you tell us about what Mr. Sweeney said about that?
19   A.  Well, he had told me that during the conversation that he
20   was doing everything, and which consisted of kidnapping,
21   murder and drugs.
22   Q.  Now, when he mentioned kidnappings, did you ask him any
23   questions about that?
24   A.  Yes.
25   Q.  What was your reaction when he said, kidnappings?

Page 56

1    A.  I was a little amazed. That's something that you rarely
2    hear about. People kidnapping people unless they're going to
3    do it for revenge or something like that, but just something
4    that people don't usually do.
5    Q.  Did you ask Mr. Sweeney any questions about the
6    kidnappings?
7    A.  Yes.
8    Q.  What did you say and what did he say?
9        MR. BRAMSON: Objection. May we approach?
10       THE COURT: Are you sure this is necessary?
11       MR. BRAMSON: I think it's necessary.
12       THE COURT: All right.
13   (Bench conference on the record.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 57

1    (Bench conference on the record.)
2        MR. BRAMSON: I'm going to ask for assurances that
3    this witness is only going to talk about Mr. Sweeney and what
4    Mr. Sweeney had done, and not Mr. Sweeney and others.
5        THE COURT: I understand he is not going to mention
6    the names of any other persons.
7        MR. BRAMSON: That was for the other matter. Let me
8    make sure that no matters -- again, even if he says, we, you
9    know, we were doing is an improper inference to the rest of
10   the defendants in this case. I think if the Court allows this
11   kind of testimony that the Court should limit it to what
12   Sweeney said Sweeney was doing and nobody -- there's no, we
13   were going to, or me and the boys or anything of that nature.
14       THE COURT: If he was doing it collectively, then he
15   is going to be allowed to -- the witness is going to be
16   allowed to disclose that the admission was made as to
17   collective behavior. As long as he doesn't mention any names
18   at this point.
19       MR. KIERSH: Your Honor, while we're up here, again,
20   I'm learning information during this examination from my
21   client. I mean, information is coming to me from both sides,
22   and it's -- this is a bombshell, the information that's coming
23   out, the testimony that's coming out
24       THE COURT: I imagine it's somewhat of a surprise.
25       MR. KIERSH: It's a surprise, and the substance of

15 (Pages 54 to 57)

CR 98-329                    UNITED STATES  vs.  VINCENT HILL, et al.                    AFTERNOON SESSION

Page 58

1  it is obviously very damning to my client.
2      THE COURT:  I wouldn't think so.
3      MR. KIERSH:  Well, it is.  We all can see that.  But
4  what I'm also learning is that apparently this man in Charles
5  County did the same thing.  Went down to Charles County.
6  Someone who is awaiting trial, and became friendly with that
7  person and provided testimony --
8      THE COURT:  Why are you telling me this right now?
9      MR. KIERSH:  Because I'm telling this to you because
10 I need time.
11     THE COURT:  This is in the middle of the
12 examination.  I have ruled on an objection.
13     MR. KIERSH:  Right.  And I need time to investigate.
14     THE COURT:  I'll talk to you about that at the
15 appropriate time.
16     MR. KIERSH:  Fine.
17     (End of bench conference.)
18
19
20
21
22
23
24
25

Page 59

1      (End of bench conference.)
2      THE COURT:  The objection is overruled.  What's your
3  question again?
4  BY MR. ZEIDENBERG:
5  Q.  I think my question was what questions, if any, did you
6  ask Mr. Sweeney about the kidnappings he had been involved
7  with, and what was his response?
8  A.  I asked was kidnapping profitable?  He said, yes.
9  Q.  Did he elaborate?
10 A.  Yes.
11 Q.  What did he say?
12 A.  He told me that he kidnapped one person twice, and he
13 kidnapped another person.
14 Q.  What was your reaction when he said that he kidnapped one
15 person two times?
16 A.  I wanted to know why?
17     MR. KIERSH:  Objection, Your Honor.
18     THE COURT:  Overruled.
19 BY MR. ZEIDENBERG:
20 Q.  What was your reaction?
21 A.  I was kind of stunned, you know, at the fact he had hit
22 the same person twice.  And I asked him, I said, so you all
23 must have had masks or something on?  He said, yeah.
24     Sorry.  I was talking too fast.  I asked him did they
25 have masks or something one when they kidnapped him, and he

Page 60

1  said, yes.
2      The first time he said he kidnapped this guy, his name
3  was Kenneth or Keith Johnson, Whitey, something like that.
4  And they got a big chunk of money from somebody by the name of
5  Gooch.  I don't know him either.
6      I said, well, what happened on the second time?  He said,
7  second time we snatched him at Potomac Gardens, and he tried
8  to jump out the car and run, and I shot him.
9  Q.  Did Mr. Sweeney indicate whether or not the person lived
10 or died?
11 A.  No.
12 Q.  This was one particular kidnapping he described to you
13 involving Whitey?
14 A.  Yes.
15 Q.  And he said Whitey was kidnapped two times, is that your
16 testimony?
17 A.  Yes.
18 Q.  Now, did he tell you about another kidnapping involving
19 another individual?
20 A.  Yes, but it wasn't any name.
21 Q.  What did Mr. Sweeney tell you about the second
22 kidnapping?  And when I say second kidnapping I mean other
23 victim.
24 A.  He said they had snatched him and threw him in the trunk
25 of the car, and while they were driving the guy kicked the car

Page 61

1  trunk open and got out and started running, and they jumped
2  out of the car and shot him in his hip or his ass and he still
3  got away.  I said, that's kind of preposterous.  I said you
4  shot him and he still got away?  And he said yes.
5  Q.  Did you believe that story?
6  A.  No, I still don't.
7  Q.  What was Mr. Sweeney's tone of voice when he was
8  describing these events to you?
9  A.  As a matter of fact, he, you know, -- just an every day
10 thing, it wasn't no big deal about it.
11 Q.  Now, did you talk to Mr. Sweeney about his pending case
12 that he was awaiting trial on?
13 A.  Yes.
14 Q.  What did Mr. Sweeney tell you about that?
15 A.  Well, at different intervals he said that he didn't think
16 the government had anything on him.  And I said -- my response
17 to that, I said, Draper, I said, generally when the feds,
18 meaning the federal government, put their hands on you they
19 generally are right.  They don't just grab you up and don't
20 have anything.  I said, either you did it, you're deeply
21 involved, or you know a whole lot about it.
22 Q.  What was Mr. Sweeney's response when you said that?
23 A.  You know, I still don't think they have anything on me,
24 you know.
25 Q.  Did he tell you what his concerns were about the case

16 (Pages 58 to 61)

CR 98-329                    UNITED STATES  vs.  VINCENT HILL, et al.                    AFTERNOON SESSION

---

Page 62

1  against him?
2  A.  Yes.
3  Q.  What was that?
4  A.  A certain fellow by the name of James Montgomery.
5  Q.  What did he tell you about James Montgomery?
6  A.  That he had brought him into the organization and sort of
7  groomed him and brought him along and then the guy turned on
8  him.
9  Q.  If you could just fill in the he there and tell us that
10  again, Mr. Watson. In other words, when he said he brought
11  him into the organization --
12  A.  Mr. Sweeney brought Mr. Montgomery into the organization.
13  Is that okay?
14  Q.  Yes, thank you. And what did Mr. Sweeney say about that?
15  A.  Well, he was somewhat disappointed because Mr. Montgomery
16  had been on several murders with him and did as much as he had
17  done and now he is flipping the script. Because he got busted
18  on something else, now he is flipping on him to save himself.
19  Q.  Who is flipping on --
20  A.  Mr. Montgomery is turning on Mr. Sweeney to save himself.
21  Q.  Did Mr. Sweeney ask you any advice about that?
22  A.  Yes.
23  Q.  What did Mr. Sweeney ask you about that?
24  A.  He asked me if he could prove that Mr. Montgomery was in
25  on the killings and did as much killing as he did that would

---

Page 63

1  they, the jury or whatever, try to work in his favor. I told
2  him no, I didn't think so because it doesn't usually work like
3  that. I said usually the first person that testifies is
4  usually what they go with. And if they got you targeted as
5  the ring leader then that makes the difference.
6  Q.  What was Mr. Sweeney's response?
7  A.  Yeah, I figured as much.
8      THE COURT:  I'm sorry?
9      THE WITNESS:  Yes, I figured as much.
10  BY MR. ZEIDENBERG:
11  Q.  Now, did Mr. Sweeney talk to you about what role Mr.
12  Montgomery was to play in this case?
13  A.  He was suppose to testify against him.
14  Q.  Did you have any conversation about that fact?
15  A.  Yes. He was talking that Montgomery is going to testify
16  against him. And I said, well, if you got all this muscle and
17  all this gun power and everything, I said, why don't you just
18  kill him, you know. And he said, we been trying to get to
19  that mother fucker but the feds got him hid away too well.
20  Q.  Did he say where they had been looking for him?
21  A.  No.
22  Q.  Now, did Mr. Sweeney talk to you about his personal life?
23  A.  Yes.
24  Q.  What do you recall him telling you about that?
25  A.  He was a little down, despondent, depressed about the

---

Page 64

1  fact that he had just had a new baby boy I think he said, just
2  born baby boy, and he hadn't had a chance to really cuddle him
3  and be with him or anything, you know. And my advice was to
4  him, you know, that maybe he should go on and tell the
5  lady to go on and get her own life, go ahead and find another
6  life, because from what you're telling me all the time you're
7  going to have, you know, you can't expect her to wait around
8  for you. And he said, yeah. He said, -- he said, these
9  bitches are no good anyway. He said, I had to down a couple
10  of them anyway, you know, so --
11  Q.  Let me go back over it. What is it -- when you told him
12  that he should tell the woman, his girlfriend or wife, to go
13  on without him, what was his response?
14      MR. BRAMSON:  Objection, Your Honor, relevance to
15  this trial.
16      THE COURT:  Approach the bench.
17      (Bench conference on the record.)
18
19
20
21
22
23
24
25

---

Page 65

1      (Bench conference on the record.)
2      MR. KIERSH:  Your Honor, I am not joining in this
3  particular objection.
4      THE COURT:  What is the relevance?
5      MR. ZEIDENBERG:  The relevance is that he will say
6  that Mr. Sweeney said she was -- words to the effect that she
7  was -- he agreed with the advice and said that she is a
8  treacherous -- there are a lot of treacherous bitches out
9  there anyway, and we had to down a few bitches ourselves,
10  meaning kill them.
11      MR. KIERSH:  I'm sorry. I didn't hear the last
12  part.
13      MR. ZEIDENBERG:  He basically said he had to kill a
14  few women.
15      THE COURT:  Treacherous bitches.
16      MR. BRAMSON:  I will ask if Mr. Kiersh is now
17  joining in my objection?
18      MR. KIERSH:  No, no.
19      THE COURT:  Your objection is overruled. Let's go.
20      MR. BESHOURI:  Your Honor, if I may come back. As I
21  overheard this talk about getting to treacherous bitches, now
22  we have moved from the realm of there is a universe of people
23  that Mr. Sweeney might be working with to Sam Carson, who is
24  charged with killing three women in this indictment. So we
25  revisit the Bruton problem here. He is speaking about

---

Beverly J. Byrne
Official Court Reporter

CR 98-329                   UNITED STATES  vs.  VINCENT HILL, et al.          AFTERNOON SESSION

---

Page 66

1  something that Mr. Sweeney told him that I won't be able to
2  cross examine about. And now we are focusing on the kind of
3  crimes that the government alleges Sam Carson has committed.
4         THE COURT: I see your problem. It isn't, however,
5  a Bruton situation or controlled by the Bruton precedent.
6         MR. BESHOURI: Simply because it wasn't a confession
7  of --
8         THE COURT: That's what happens when you have a co-
9  defendant who has got a loose mouth. The objection is
10  overruled.
11      (End of bench conference.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 67

1      (End of bench conference.)
2  BY MR. ZEIDENBERG:
3  Q.  Mr. Watson, going back to the conversation you had about
4  Mr. Sweeney's domestic situation, after you advised Mr.
5  Sweeney that perhaps he should tell his baby's mother, wife,
6  however you described it, as someone who should go on with her
7  life without him, can you tell us what his response was to
8  that?
9  A.  Well, he kind of agreed with it, and he felt that -- he
10  said he had a little animosity towards women, particular
11  women. And he said, yeah, these bitches no good anyway, you
12  know, because I had to down a couple of them anyway.
13  Q.  He said, I had to down a couple of them anyway?
14  A.  Yeah. Yeah.
15  Q.  And when you say the term, down a couple of them, what
16  did you understand that to mean?
17         MR. BRAMSON: Objection.
18         THE COURT: Overruled.
19         THE WITNESS: Kill them.
20  BY MR. ZEIDENBERG:
21  Q.  I'm sorry?
22  A.  Kill them.
23  Q.  Now, did Mr. Sweeney tell you how it was, other than
24  kidnapping, he was able to make money while he was out on the
25  outside?

---

Page 68

1  A.  He said he did a whole lot of crack cocaine and had boat
2  loads of weed.
3  Q.  Weed?
4  A.  Marijuana.
5  Q.  Now, Mr. Watson, if you could, could you tell the ladies
6  and gentlemen how it is you came to the attention of the U.S.
7  Attorney's Office, you personally?
8  A.  I had spoken with Mr. Sweeney but really I had forgotten
9  all about him, because things he was saying was somewhat
10  preposterous and ludicrous to me, so I didn't really pay him
11  any more attention, and that was back in March of 2000. And
12  around December 2000, when I was at this institution, my buddy
13  and I came into the mess hall and as we were about to leave he
14  was finishing up his meal, and I was sitting there talking to
15  him, and four young fellows came in behind us and sat down
16  behind us and they were talking. They said, yeah --
17         MR. BRAMSON: Objection.
18  BY MR. ZEIDENBERG:
19  Q.  I am not going to ask you -- in fact, I am going to ask
20  you not to repeat the conversation. But let me try and do it
21  this way. At some point did you contact an attorney?
22  A.  Yes.
23  Q.  What was your purpose in contacting an attorney?
24  A.  Well, I have 105 months to do. I am 67 years old. And I
25  wanted to try to get some time off me, and I felt this was one

---

Page 69

1  of the ways to do it, and I contacted Mr. G. Allen Dale and
2  told him what I knew about the incident that happened in
3  Northern Neck. And he said, well, I know someone who might be
4  interested, and the next thing I know I was here talking to
5  you and your lovely assistant there.
6         THE COURT: Mr. Watson, I wrote your age down as 60.
7  Is it 60 or 67?
8         THE WITNESS: 60.
9         THE COURT: 60?
10         THE WITNESS: 60.
11  BY MR. ZEIDENBERG:
12  Q.  And what is it you're hoping to get -- what promises have
13  been made to you in regards to your cooperation?
14  A.  Well, you told me that you would make the prosecutor that
15  sentenced -- the prosecutor that prosecuted me in Greenbelt
16  aware of the extent and the nature of my cooperation. And I
17  am looking for Rule 35, which is a motion that the prosecutor
18  has to submit to the Judge. And the Judge has the final say
19  as to whether he will give it to me or not. If I don't get
20  it, then I'm back to square one.
21  Q.  Just to go through these hoops once again, you were
22  prosecuted out of what court?
23  A.  Greenbelt, United States District Court.
24  Q.  And it's your understanding -- what, if any, control does
25  this United States Attorney's Office here in the District of

---

Beverly J. Byrne
Official Court Reporter

CR 98-329    UNITED STATES  vs.  VINCENT HILL, et al.    AFTERNOON SESSION

Page 70

1  Columbia have over the United States Attorney's Office in
2  Greenbelt?
3  A.  Absolutely none.
4  Q.  And what is it you're hoping that we will do for you?
5  A.  As I said before, bring to the prosecutor's attention the
6  extent and nature of my cooperation.
7  Q.  And what is your understanding about whether the
8  prosecutor in Greenbelt is obligated to take any suggestions
9  or advice from us?
10  A.  He doesn't have to.
11  Q.  And if that prosecutor were to file a Rule 35 motion,
12  what's your understanding about what obligation the Court who
13  sentenced you in Greenbelt, the Judge in Greenbelt, would have
14  to --
15  A.  He could still say no.
16  Q.  What is it that you're hoping ultimately will happen?
17  A.  That I will get a reduction in sentence.
18      MR. ZEIDENBERG:  I have no further questions, Your
19  Honor.
20      THE COURT:  Mr. Watson, don't tell me where, but are
21  you now in a federal institution?
22      THE WITNESS:  At the moment, no, Your Honor.
23      THE COURT:  And can you tell me the date that you
24  were sentenced?
25      THE WITNESS:  February 2, -- no, February 4, 2000.

Page 71

1      THE COURT:  February 4, 2000, all right.
2      MR. ZEIDENBERG:  I have nothing further, Your Honor.
3      THE COURT:  All right.  Cross examine?
4      MR. ZUCKER:  Your Honor, may we approach for a
5  second?
6      THE COURT:  Yes.
7  (Bench conference on the record.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 72

1  (Bench conference on the record.)
2      MR. ZUCKER:  Your Honor, the Court has imposed a
3  rule which already I have gotten into a transgression with.  I
4  am certain that there is going to be overlapping areas of
5  cross examination between Mr. Kiersh, myself, and all other
6  defense counsel who choose to examine this man.  Now, given
7  your ruling that we may not examine on the same issues, I
8  think we at least need an opportunity to consult and see what
9  each wants to do.  I don't want to be in the situation we were
10  in before, where he asks a question in an area -- he asks
11  about consideration on a Rule 35 and I am precluded from doing
12  it.
13      THE COURT:  Well, what are you asking for?  Are you
14  asking to postpone cross examination until Monday?
15      MR. ZUCKER:  Well, I will defer to Mr. Kiersh.  I
16  mean, either that or change your rule.  You asked us to
17  consult as one and only one defense counsel can do something.
18  I can't control anybody else's cross.  Did you say denied?  I
19  didn't hear you.
20      THE COURT:  I didn't say anything, so you have
21  nothing to respond to.
22      MR. KIERSH:  Your Honor, I'm asking for us to recess
23  now.
24      THE COURT:  You want to wait until Monday?
25      MR. KIERSH:  Yes.

Page 73

1      THE COURT:  Where would he stay?
2      MR. ZEIDENBERG:  We have arrangements, I believe.
3      THE COURT:  Okay.
4      MR. KIERSH:  Even if he would want to bring someone
5  else on, if they have a shorter witness to put on now,
6  something like that, to take up time.  I am not looking to
7  delay this, but --
8      MR. ZEIDENBERG:  Your Honor, with all due respect to
9  defense counsel, we were told not to call the mobile crime
10  officer because Ms. Hepworth wants time to practice her cross
11  over the weekend, and now Mr. Kiersh is telling us instead of
12  that mobile crime --
13      THE COURT:  We will recess.  We are only 20 minutes
14  from the ordinary time of concluding for the week anyhow.  We
15  will recess until Monday morning.
16      MR. ZEIDENBERG:  Very well.
17  (End of bench conference.)
18
19
20
21
22
23
24
25

Beverly J. Byrne
Official Court Reporter